UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| TINA M. MELLOTT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 3:11-CV-92 TLS |
| ) | |
| MICHAEL J. ASTRUE ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

On July 28, 2011, Plaintiff, Tina M. Mellott ("Mellott") filed her complaint seeking review of the final decision of the Commissioner of Social Security ("Commissioner"). She filed her opening brief on July 28, 2011, and the Commissioner filed his response on November 8, 2011. Mellott filed her reply brief on November 29, 2011. This Court now enters its ruling based on the consent of the parties and 28 U.S.C. § 636(c).

**I.  PROCEDURE**

On September 1, 2006, Mellott filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act. Her application arose from an alleged disability beginning May 23, 2005. Her claim was denied on June 12, 2007, and again upon reconsideration on February 11, 2008. On February 25, 2008, Mellott appeared at a hearing before an administrative law judge ("ALJ"). The ALJ issued his decision on July 19, 2010, denying Mellott's claim for benefits. Mellott then filed her complaint in this Court pursuant to 42 U.S.C. § 405(g).

**II.  ANALYSIS**

    **A.  Facts**

Mellott was born on November 27, 1962 and was 47 years old at the time the ALJ issued his decision (Tr. 259). Her highest level of education is four or more years of college (Tr. 280). She has past relevant work experience as a museum curator and director (Tr. 283).

1. **Medical Evidence**

On May 23, 2005, Mellott went to the hospital with symptoms of cardiac problems (Tr. 391). She was ultimately diagnosed with a type of coronary artery disease, and underwent a stent placement (Tr. 397-398). She underwent cardiac rehabilitation from June 1, 2005 to August 8, 2005 (Tr. 426-470). Treatment notes dated June 2, 2005 to August 31, 2005 from a cardiologist indicated that Mellott felt poorly and complained of fatigue (Tr. 473).

In December 2005, a rheumatologist explained that Mellott suffered from muscle pain, fatigue, and night sweats since she began statin therapy for her heart condition (Tr. 531). He recommended that she discontinue the statin therapy, but her pain still continued (Tr. 529, 531).

Mellott went to the Mayo Clinic in April 2006 to determine the cause of her pain and fatigue (Tr. 569). At the Clinic, Mellott was diagnosed with a "fibromyalgia-like syndrome" because she had muscle and joint pain, but did not have the classic trigger points for a fibromyalgia diagnosis (Tr. 568). The physician found no evidence of an alternative disorder (Tr. 570). A letter written by the Mayo Clinic physician in October 2006 stated that the majority of Mellott's symptoms were a consequence of fibromyalgia (Tr. 566).

On December 14, 2006, a physician performed a medical record review for Mellott's employer's long-term disability insurance provider (Tr. 558). He diagnosed Mellott with coronary artery disease post-stinting, with no evidence of recurrent ischemia, and no active cardiovascular disease (Tr. 561). He also diagnosed Mellott with a history of chest pain

2

controlled with medicine, hypertension controlled with medicine, depression and anxiety, and a
"fibromyalgia-like syndrome" (Tr. 561). The reviewing physician believed that Mellott could
return to her job as a museum curator (Tr. 562).

On December 22, 2006, a cardiologist performed a medical record review for the
insurance provider (Tr. 600). In his opinion, Mellott was not disabled from a cardiac standpoint,
but deferred to a more specialized physician regarding the fibromyalgia (Tr. 601). He believed
that Mellott should have been able to return to work as a museum curator in June 2005. *Id.*

A state agency psychologist examined Mellott on May 15, 2007 (Tr. 628). Mellott stated
that her depression was caused by her medical conditions, but that taking an antidepressant
helped. *Id.* He believed that Mellott's social skills were adequate, and noted that she was fine
with all aspects of self-care, and she performed most domestic functions (Tr. 630). The
psychologist's diagnosis was an adjustment disorder with depressed mood (Tr. 631). Mellott
was assigned a GAF score of 55.[1] *Id.*

On May 22, 2007, a state agency physician performed a medical examination of Mellott
(Tr. 632). The physician noted that Mellott had an intention tremor (a tremor that occurs during
the performance of precise, voluntary movements) (Tr. 635). Mellott had trouble with a
coordination test, but her neurological examination was otherwise normal. *Id.* The physician
observed that Mellott's tandem walking was poor, and that she could stand on one leg at a time
for only one to two seconds (Tr. 636). However, she was able to perform half of a squat
maneuver without difficulty. *Id.* The physician's assessment was that Mellott had neurologic

---

[1] GAF scores represent on a single day an individual's overall level of functioning, including symptom severity. The GAF numeric scale runs from 0 through 100. The higher the GAF score, the less severe the symptoms and the individual will have a higher level of functioning.

3

problems, a history of coronary artery spasm, and that she was easily fatigued. *Id.* In his opinion, Mellott was not suitable for the workplace at that time. *Id.*

On December 21, 2007, a consulting physician performed a physical examination on Mellott (Tr. 747). Mellott complained of muscle pain, sharp chest pain at rest, numbness on the left side of her body, anxiety, and depression, but denied ever being diagnosed with depression or anxiety (Tr. 747-748). She also stated that an MRI showed that she did not have multiple sclerosis (Tr. 748-749). The physician noted that Mellott seemed to be nervous, but did not appear to have any tremor (Tr. 751). Also, Mellott did not have any difficulty with any of the physical agility tests (Tr. 750-751). In the physician's opinion, in the workplace Mellott should not climb ladders, ropes, scaffolding, work around unprotected heights, operate automotive or dangerous equipment, but she should be able to perform at least light work eight hours per day (Tr. 752).

On January 8, 2008, Mellott's treating cardiologist, Dr. Mirro, wrote a letter to Mellott as a follow-up to her Social Security disability, opining that it was impossible for her to work based on her continued symptoms related to chronic pain (Tr. 822). He also noted that she continued to suffer from chest pains, but did not know how this related to her chronic pain. *Id.* On January 14, he completed a form on her ability to do work-related activities stating that Mellott could perform less than sedentary work (Tr. 819-820).

On May 27, 2008, Dr. Mirro wrote a letter to Mellott's attorney stating that he did not believe that she could sit for more than four hours a day (Tr. 945). He also noted that Mellott had problems with dizziness and that she was prevented from pushing and pulling. *Id.* In his opinion, because of her chronic pain and coronary disease, Mellott was totally disabled. *Id.* Dr.

4

Mirro wrote another letter in March 2009 reporting that Mellott had another episode of chest pain that had been resolved with medicine, and that her chronic muscle pain had dramatically improved with steroids (Tr. 918). A heart test in September 2009 showed that other than an enlarged left ventricle, Mellott's test was normal from a cardiac standpoint (Tr. 915).

### 2. ALJ Hearing on February 25, 2010

#### a. Mellott's Testimony

At the time of the hearing, Mellott had not worked for four years (Tr. 34). She alleged that she quit her job as a museum director/curator because she was unable to perform the duties required. *Id.* She testified that she experienced pain whenever she sat or stood (Tr. 35). She said that she took two different prescription pain killers (Tr. 36). Additionally, she testified that she could walk, stand, or sit for ten to fifteen minutes at a time, alternating (Tr. 38-39). She believed that anything weighing more than a gallon of milk was too much for her to carry (Tr. 40).

During a typical day, Mellott would take a bath, meet one of her friends for coffee, rest, have dinner with her family, and then go to bed. *Id.* She said that she helped around the house by putting clothes in the washing machine, but someone else had to put them in the dryer (Tr. 41). In her free time she enjoyed writing, and she had a software program that allowed her to speak the words into her computer. *Id.* She was also in a writing club that met once per month (Tr. 43). Mellott said she did not drive more than twenty five minutes at a time, and she felt fatigued everyday (Tr. 42, 44).

#### b. Vocational Expert's Testimony

At the hearing, the vocational expert said that in the record Mellott's previous job was

identified as a regional curator, but according to her testimony, she was a museum director (Tr. 47). He said that the jobs were both similar, but the museum director position was generally a sedentary position. *Id.* The ALJ then asked the vocational expert if someone who was Mellott's age and had the same education and work history as Mellott would be able to perform any of her past employment. *Id.* The ALJ further limited the hypothetical to someone who was restricted to jobs that did not require more than occasional climbing, crouching, crawling, kneeling, and stooping. *Id.* The vocational expert responded that such an individual would be able to perform Mellott's past work as a museum director (Tr. 48).

The ALJ then asked the vocational expert if this person could perform the museum director position as Mellott usually performed it because Mellott described the position as more than sedentary. *Id.* The ALJ said that a person with Mellott's limitations would be able to perform the job as usually performed, but not as Mellott had performed the job. *Id.* Finally, the vocational expert said that a person with Mellott's alleged limitations would not be able to perform any of Mellott's past employment or any other jobs that exist in significant numbers (Tr. 49).

### c. ALJ Determination

On July 19, 2010, the ALJ found that Mellott was not disabled because she did not have an impairment or combination of impairments that met one of the listed impairments (Tr. 20). Further, he found that Mellott's testimony was not credible and that she had the residual functional capacity ("RFC") to perform sedentary work, including past relevant work as a museum director (Tr. 16, 20).

### B. Standard of Review

The standard of review for an ALJ's decision is whether it is supported by substantial evidence and free of legal error. *See* 42 U.S.C § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Golembiewski v. Barnhardt*, 322 F.3d 912, 915 (7th Cir. 2003). However, an ALJ's legal conclusions are reviewed *de novo*. *Haynes*, 416 F.3d at 626. Substantial evidence is more than a scintilla and means such relevant evidence as a reasonable mind might accept to support such a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1972). A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes*, 416 F.3d at 626. An ALJ decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

### C. Mellott's Motion for Remand

Mellott must establish that she is disabled to be entitled to benefits under the Social Security Act. *See* 42 U.S.C. § 423(a)(1)(D). The Act specifically defines "disability" as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the

7

claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920; *Briscoe*, 425 F.3d at 352. If the ALJ can find that the claimant is not disabled at any step, he does not go on to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

An impairment or combination of impairments is considered severe if the applicant's physical or mental ability to perform basic work activities is significantly limited. 20 C.F.R. § 404.1521(a). The combination of impairments is taken into account, even if each individual impairment would not be considered severe. 20 C.F.R. § 404.1523. If the applicant does not meet this requirement, then the applicant is not disabled. 20 C.F.R. § 404.1520(c). In order to be considered severe, the impairment must either cause the applicant's death, or has lasted or is expected to last for a continuous period of at least 12 months. 20 C.F.R. § 404.1509. When assessing the severity of an impairment, the applicant's age, education, and work experience are not considered. *Id.* However, it is still possible for the applicant to have been disabled for a period of time in the past even if the applicant currently does not have a severe impairment. *Id.*

If the applicant's impairment or combination of impairments meets the requirements outlined in Subpart P, Appendix 1 and also meets the duration requirement, then the applicant is disabled without considering the applicant's age, work experience, or education. 20 C.F.R. § 404.1520(d). Once the ALJ finds that the applicant is not disabled after the first three steps, then the ALJ assesses the RFC. 20 C.F.R. § 404.1520(e). The RFC is the applicant's ability to do physical and mental work activities on a sustained basis despite limitations. *Id.* Once the RFC is determined, it is compared to the applicant's past relevant work to see if the applicant could still perform that type of work. 20 C.F.R. § 404.1520(f). If the applicant could still perform past

relevant work, then the applicant is not disabled. *Id.* Past relevant work includes any substantial work performed within the last 15 years. 20 C.F.R. § 404.1560(b)(1). The applicant has the burden to prove the first four steps, but upon reaching step five, the burden shifts to the Commissioner. 20 C.F.R. § 404.1520(e).

Mellott contends that the ALJ erred by failing to evaluate the opinion of the state agency physician that stated in May 2007 that Mellott was not suitable for work.

First, it must be determined how much weight the ALJ should have given the state physician's opinion. Treating sources are given more weight than nontreating sources. 20 C.F.R. § 1527(d)(2). A nontreating source is "a physician . . . who has examined you but does not have, or did not have, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Because the state physician only examined Mellott once, he was a nontreating source. The ALJ is not required to give controlling weight to a nontreating source's opinion. *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). He is allowed to decide the weight given by considering factors such as the length and extent of the treatment relationship, whether the physician supported his opinion with sufficient explanation, and whether the physician specializes in the medical condition at issue. 20 C.F.R. § 404.1527(d)(2)-(5), *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). "If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ minimally articulated his reasons–a very deferential standard that we have, in fact, deemed lax." *Elder*, 529 F.3d at 415. However, an ALJ may not dismiss a line of evidence that is contrary to his findings." *Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir. 2009).

Here, the ALJ failed to state why he did not consider the state physician's May 2007

opinion that Mellott was not suitable for work. He did not discuss the treatment relationship, the physician's explanation, or the physician's specialization. The ALJ's only discussion of the state physician's opinion was how the results of a coordination test he gave Mellott differed from one given by a different physician the previous year (Tr. 18). Given the magnitude of the state physician's opinion, that Mellott "does not appear to be a suitable workplace candidate at this time," the ALJ needed to at least minimally articulate his reasons for not considering it (Tr. 636). This was error. *See Villano*, 556 F.3d at 558.

### III. CONCLUSION

Because the ALJ failed to properly consider the state physician's May 2007 opinion, the Court **RECOMMENDS** that the case be **REMANDED** for further proceedings.

> **NOTICE IS HEREBY GIVEN that within ten (10) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER**.

**SO ORDERED**

Dated this 10th day of January, 2012.

S/Christopher A. Nuechterlein<br>
Christopher A. Nuechterlein<br>
United States Magistrate Judge